## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**U.S. SECURITIES AND EXCHANGE COMMISSION,**

      **Plaintiff,**

      **v.**

**LOUIS T. BUONOCORE,
JEREMY R. DRAPER,
FRANK J. MORELLI, III,
BERARDINO "DINO" PAOLUCCI, JR., and
DON L. ROSE,**

      **Defendants.**

**Case No.**

**Jury Trial Demanded**

## COMPLAINT

Plaintiff U.S. Securities and Exchange Commission ("Commission" or "SEC") alleges:

## SUMMARY

1.      This case involves a fraudulent scheme to manipulate the market and price for the stock of Ecoland International, Inc. ("Ecoland") (now known as Novus Robotics, Inc.), a penny stock company whose securities were quoted on the OTC Bulletin Board ("OTCBB"). After acquiring control of Ecoland and its publicly traded stock, Defendants employed a variety of fraudulent and deceptive practices to drive up demand for and the price of Ecoland stock. Defendants then dumped their own shares on unsuspecting investors, raking in over $3.2 million in about 6 months.

2.      Defendants Berardino "Dino" Paolucci, Jr., Donald Rose, and Frank J. Morelli, III hatched the scheme during a meeting in the Dominican Republic in May 2011. At that meeting, they agreed, among other things: (a) to acquire a public U.S. penny stock company; (b)

to manipulate the market for and price of the company's stock through a fraudulent promotional campaign involving the coordinated issuance of company press releases, false and misleading email blasts urging investors to buy the stock without disclosing their controlling ownership interest and their intent to sell the stock, and matched trading; and (d) and to split the profits among the scheme participants, which later included Defendant Louis T. Buonocore.

3.       Soon after the meeting, and with the continued assistance of Defendant Jeremy R. Draper, Defendants acquired a controlling interest in Ecoland and began their fraudulent promotional campaign to drive up public demand for and the price of Ecoland's stock.  By March 2012, Defendants had dumped millions of shares of overvalued Ecoland stock into the hands of unwary investors, generating millions of dollars in illicit sales proceeds for themselves.

4.       The SEC brings this civil enforcement action seeking permanent injunctions, penny stock bars, disgorgement, pre- and post-judgment interest, and civil penalties for Defendants' violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and Sections 10(b) and 13(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), and 78m(d)], and Rules 10b-5, 13d-1, and 13d-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1, and 13d-2].

## JURISDICTION AND VENUE

5.       The Commission brings this action under Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]. The Commission seeks the imposition of civil penalties pursuant to Section 20(d)(2)(C) of the Securities Act [15 U.S.C. § 77t(d)(2)(C)] and Section 21(d)(3)(B)(iii) of the Exchange Act [15 U.S.C. §§ 78u(d)(3)(B)(iii)].

6.       The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21 and 27 of the Exchange

Act [15 U.S.C. §§ 78u and 78aa] because Defendants directly and indirectly made use of the means or instrumentalities of interstate commerce and the mails in connection with the fraudulent and deceptive transactions described herein.

7.      Venue is proper in this District under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Defendant Morelli resides in this District, and acts and transactions constituting the securities violations described herein occurred in this District. Some investors who purchased Ecoland stock and were victimized by Defendants reside in this District.

## DEFENDANTS

8.      Louis T. Buonocore, age 61, resides in Woburn, Massachusetts. Buonocore worked as a registered representative at nine firms between 1988 and 1996 and held Series 7 (General Securities Representative) and Series 63 (Uniform Securities Agent State Law) licenses. In 1996, Buonocore was censured, fined, and suspended from association by the NASD. In 1998, the NASD revoked Buonocore's securities licenses for failing to pay NASD fines.

9.      On June 1, 2000, Buonocore was sentenced to serve 18 months in federal prison after being convicted of one count of conspiracy to commit securities fraud and three counts of securities fraud. (*U.S. v. Bakal et al.*, 1:98-cr-00329 (S.D.N.Y.)). On or about November 19, 2015, Buonocore pled guilty to wire fraud, conspiracy, and securities fraud based on his manipulation of the securities of Super Nova Resources, Inc. ("Super Nova"). (*U.S. v. Marciniak et al.*, 2:14-cr-00133 (E.D. Pa.)). On or about November 17, 2015, Buonocore pled guilty to conspiracy and securities fraud for participating in a pump-and-dump scheme involving the securities of penny stock company YaFarm Technologies, Inc. ("YaFarm"). (*U.S.*

*v. Buonocore*, 1:15-cr-10272 (D. Mass.)). On September 21, 2015, the Commission filed a civil

action against Buonocore based on his role in the YaFarm pump-and-dump scheme. (*SEC v.*

*Morelli, III, et al.*, 1:15-cv-13396 (D. Mass.)).

10.     Jeremy R. Draper, age 39, resides in Liverpool, New York. Draper conducts

business through Sipada, Inc., a company he owns and operates as his alter ego. Between at

least 2006 and January 2015, Draper worked in the penny stock industry, often acting as an

agent for shell companies used in reverse and public shell mergers.

11.     Frank J. Morelli, III, age 60, currently is incarcerated in Philadelphia,

Pennsylvania, awaiting sentencing for his role in a market manipulation scheme involving the

securities of Super Nova, Inc. Prior to his incarceration, he resided in Florence, Colorado. On

February 18, 2010, the Commission filed a civil action against Morelli and others for violating

Sections 5(a) and (c) of the Securities Act. (*SEC v. Greenstone Holdings, Inc.*, 1:10-cv-01302

(S.D. N.Y.)). Pursuant to Morelli's consent, on June 30, 2011, the court entered a final judgment

against him imposing a permanent injunction, a one-year penny stock bar, disgorgement and

prejudgment interest, and a civil penalty of $55,000. On September 21, 2015, the Commission

filed a civil action against Morelli based on his participation in the YaFarm pump-and-dump

scheme. (*SEC v. Morelli, III.*, 1:15-cv-13396 (D. Mass.)). On September 22, 2015, pursuant to

Morelli's consent, the court entered partial judgment against him imposing, among other relief,

an officer and director bar and a permanent penny stock bar.

12.     Berardino "Dino" Paolucci, Jr., age 38, resides in Mississauga, Ontario, Canada.

Paolucci promotes penny stock companies through certain websites under his control, including

The Bull Exchange, PennyPlayersClub.com, InsanePennies.com and Marketbulls.com. Many of

the penny stock companies he promotes, including Ecoland, have securities that are quoted on

the OTCBB and are purchased and sold by United States citizens and residents.

13.     At all times relevant to the events alleged in this Complaint, Paolucci worked as a project manager for D&R Technology, Inc. ("D&R"). D&R, a private corporation formed under the laws of Ontario, Canada, claims to be in the business of manufacturing parts used in the automotive industry. D&R was acquired by Novus Robotics, Inc. on January 27, 2012. D&R was majority-owned and controlled by Paolucci's father.

14.     Don L. Rose, age 59, resides in Port Jefferson Station, New York. Between 1994 and 1997, Rose worked as a registered representative at several registered broker-dealers where he previously held Series 7 and Series 63 securities licenses. Since at least 2005, Rose has been engaged in the promotion of certain penny stock companies, often operating through entities he owns and controls, such as Global Media Fund International, Inc. ("Global Media") and Sono Associates, LLC ("Sono").

## RELATED ENTITY

15.     Novus Robotics, Inc. ("Novus") is a Nevada corporation based in Mississauga, Ontario, Canada. In its most recent Form 10-K filed with the Commission on April 20, 2016, Novus stated that it is in the business of "engineering, design and manufacturing of robotics and automation technology solutions for tube bending machines" used in the automotive industry.

16.     Novus was originally incorporated in Nevada in 2005 under the name "Guano Distributors, Inc." At the time, it claimed to be in the business of distributing bat guano. On June 28, 2006, it changed its name to "Ecoland International, Inc." According to Novus's Form 8-K filings with the Commission, D&R was merged into Ecoland's corporate shell on or about January 27, 2012. Ecoland changed its name to "Novus Robotics, Inc." on or about February 21, 2012.

17.     At all times relevant to the allegations in this Complaint, the stock of Novus

(including its predecessor, Ecoland) was registered with the Commission pursuant to Section

12(g) of the Exchange Act and was traded on the over-the-counter securities markets in the

United States under the trading symbols ECIT, when named Ecoland, and NRBT, when named

Novus.

## FACTS

A.     **Defendants Morelli, Paolucci and Rose Meet
        To Devise Their Fraudulent Scheme.**

18.     By 2011, Defendants Paolucci, Morelli, and Rose either knew or had heard about

each other from their prior participation in stock manipulation schemes. In May 2011, all three

men agreed to meet in the Dominican Republic to hatch a new scheme using D&R, which was

owned and controlled by Paolucci's father.

19.     At this initial meeting, Paolucci told Rose and Morelli he wanted to start

promoting D&R, and asked for their help finding a public company to acquire D&R. Paolucci

said he wanted to use the acquiring company as a platform to sell stock to the investing public.

Rose had not worked with Paolucci before, but knew Paolucci was in the business of promoting

penny stock companies.

20.     At the meeting in the Dominican Republic, Paolucci, Rose, and Morelli

(collectively, the "Scheme Group" or "Schemers") orally agreed to launch a market

manipulation scheme that included the following plan:

> (a) Rose and Morelli would find an OTCBB company with a large block of
> unrestricted stock into which Paolucci could eventually merge D&R;
>
> (b) Rose would act as the Scheme Group's nominee because Morelli was a
> defendant in a pending SEC enforcement action and Paolucci's affiliation with
> D&R limited his ability to sell unrestricted stock in the combined company;
>
> (c) as the Scheme Group's nominee, Rose would acquire control of the public

OTCBB company through the purchase of its stock;

(d) the Scheme Group would conduct a promotional campaign using email blasts, internet promotions, and the issuance of press releases hyping the company and its stock, but not informing potential investors of the Schemers' control of the company and their intent to sell their own stock;

(e) the Scheme Group, acting primarily through Rose, would sell company stock in coordination with the promotional campaign; and

(f) the Scheme Group would divide the stock sale proceeds, with Paolucci receiving 65% and Rose and Morelli and any others who joined the scheme splitting the remaining 35%.

21.      Soon after the meeting, Rose contacted Draper, whom Rose knew from his work on prior deals, to request his assistance in identifying a public company for the reverse merger with D&R. Draper agreed to assist Rose in exchange for a fee of at least $15,000.

22.      On July 18, 2011, Draper emailed Rose and told him he identified Ecoland as a good OTCBB company for the planned merger. Rose agreed Ecoland was a good fit because it did not have a lot of debt or other financial problems.

23.      Rose sent Paolucci a written summary containing the following details about Ecoland as a potential acquisition candidate:

(a) Ecoland was incorporated in Nevada;

(b) it filed reports with the Commission;

(c) it did not have outstanding liabilities or legal issues;

(d) it had 88,650,000 outstanding shares of stock, with 22 million "deliverable free trading" shares; and

(e) its stock recently traded for $0.21.

24.      Paolucci agreed Ecoland was a suitable company for the scheme. In an email to Rose, Paolucci wrote: "At first glance this looks to have the makings of a very clean prospect."

25.      The Scheme Group agreed to acquire control of Ecoland to carry out their plan.

**B.** **The Acquisition of Ecoland.**

26.    Over the last two weeks of July 2011, Rose, as the Scheme Group's nominee and with Paolucci's input and approval, negotiated with the controlling shareholders of Ecoland to purchase their interest in the company.

27.    On July 28, 2011, Rose, through his entities Global Media and Sono, entered into letters of intent and escrow agreements to purchase 62 million shares of restricted Ecoland stock (all but 4,650,000 of the total restricted shares) and all 22 million unrestricted shares of Ecoland for $485,000. Through this agreement, the Scheme Group gained control and/or influence over more than 90% of Ecoland's stock.

28.    In early August 2011, Rose and Morelli paid $155,000 towards the purchase of the Ecoland stock and began the process of gaining control of the unrestricted stock by coordinating with attorneys, accountants and escrow agents. Rose and Draper worked to acquire certificates for the unrestricted Ecoland stock from the sellers. Paolucci provided Rose with the names of the people who were to receive Ecoland's restricted shares, including Paolucci's father and an entity under control of Paolucci's brother.

29.    At this time, Rose also worked with Draper to ensure that Ecoland's unrestricted stock was deposited into brokerage accounts Rose controlled and that the stock was cleared for trading. By late August 2011, 4 million shares of unrestricted Ecoland stock was released from escrow. Rose directed Draper to deposit the shares into a brokerage account Rose opened in the name of his company Global Media at Spencer Edwards, Inc., a broker-dealer registered with the Commission.

30.    In addition to the Spencer Edwards account, Draper facilitated the opening of a foreign brokerage account for Rose at Clear Water Securities, Inc. ("Clear Water") in the name of Crimson Marketing, which Rose controlled. Rose deposited two million additional

unrestricted Ecoland shares into the Clear Water account.

**C.      Defendants Put Their Scheme Into Action.**

31.      On September 28, 2011, immediately before the Schemers planned to begin promoting Ecoland through email blasts from Paolucci's stock promotion websites and the issuance of coordinated press releases, Rose and Draper conducted what they called a "test run" to ensure they had "worked out the kinks." They sold small amounts of Ecoland stock from the Spencer Edwards brokerage account that day. However, they were unable to sell any shares of stock from the Clear Water brokerage account because they could not get in touch with the broker.

32.      On September 30, 2011, Rose and Draper sold more Ecoland stock through the Spencer Edwards brokerage account and also sold stock from the Clear Water account. Their intent was to set a floor for the offer price of Ecoland stock.

33.      Draper sent orders to Clear Water asking for trades to be executed at different, increasing price points. For example, in an email dated September 30, 2011, Draper told the broker Rose wanted to execute the following sell orders: "5,000 shares @ $.15, 50,000 shares @ $.18 and 100,000 shares @ $ .20. All of those orders are GTC [good 'til cancelled] status . . . ."

34.      Draper also sent sell orders to Spencer Edwards. These sell orders were partially executed—*i.e.*, 18,500 shares were sold—between $0.15 and $0.20 per share. The total trade volume for Ecoland shares on September 30, 3011, was 21,000 shares.

35.      To generate public interest in Ecoland's largely dormant stock, the Scheme Group devised and organized a promotional campaign using press releases and email blasts that Paolucci drafted touting Ecoland stock. The Scheme Group's promotional campaign stretched from approximately October 3, 2011 through February 17, 2012, and broke down into three distinct promotional periods. The first promotional period ran from October 3, 2011 through

November 18, 2011. After a short lull, the second promotional period began on December 3, 2011 and continued until December 20, 2011. The third period ran from January 21, 2012 through February 17, 2012.

36.     During the promotional campaign, Paolucci directed Ecoland's transfer agent to issue more than a dozen press releases on behalf of Ecoland. Paolucci authored the press releases, most of which were reviewed by Rose, Morelli and, starting in October 2011, Buonocore. Paolucci timed his email blasts, which he also drafted, to coincide with the issuance of the Ecoland press releases, thereby cloaking the email blasts beneath a veil of reliability and legitimacy.

37.     Paolucci's email blasts were sent from penny stock promotional websites he controlled, such as The Bull Exchange, PennyPlayersClub.com, InsanePennies.com and Marketbulls.com. These email blasts, which were sent to subscribers of Paolucci's promotional websites, among others, hyped Ecoland and its stock and were designed to create a sense of urgency among potential investors. They stated, among other things:

- "Make sure you watch the news on this company [Ecoland] in the near future. We've been looking for another huge winner and we think that ECIT [Ecoland] has what it takes! So if you're late getting in, it's ok … just don't miss the entire party!!!"

- "We ask that you please continue to refer your trader friends, especially once you begin to see ECIT trade above current levels. ECIT should be treated like an IPO on the brink of some key developments and we want our readers to have an opportunity to assess it as an investment before WALL STREET finds out . . . KEEP WATCHING ECIT MOVE FORWARD THIS WEEK, AS WE BELIEVE A HUGE BREAKOUT IS ON THE HORIZON FOR ECIT!!!"

- "ECIT is our next WINNER and you do not want to miss out. There is no doubt about it, this stock is headed for the moon. There could be huge opportunities to cash out on big gains as this stock doubles over and over again. We encourage you to sell some off to cover your initial investment…but we must make one request: Do not wait too long or you may lose your chance to load up on these shares while they are still selling for pennies on the dollar. 'Our previous recommendation letters have turned $5,000 into $50,000 in less than 1 month!' We believe that ECIT could easily make these gains pale by comparison . . ."

- "Many of our subscribers made a lot of money. Our Inbox was flooded with thanks from those that jumped in early. Congrats and we appreciate hearing from you! We also got quite a few emails from subscribers that wished they had jumped into ECIT when we first mentioned it. Today was the perfect opportunity for those that wanted to get in and buy the dips! Shorts attempted to create a downfall and we are SURE with the RIGHT news, we will experience the MOTHER of all short squeezes. Today was a GREAT BUY opportunity!"

38.     The press releases and email blasts issued during the promotional campaign had their intended effect and, as shown below, dramatically increased Ecoland's share price and trading volume.

39.     At the same time Paolucci was issuing press releases and email blasts touting Ecoland and its stock, the Scheme Group was selling unrestricted Ecoland shares to public investors at inflated prices.

40.     However, none of the Scheme Group's press releases or email blasts disclosed the truth to the investing public: (i) that the Schemers had control and/or influence over nearly all of Ecoland's stock, (ii) that they were responsible for authoring and issuing the press releases and email blasts, or (iii) that they were selling their Ecoland stock in coordination with the issuance of the blast emails and press releases. The omission of these material facts concealed the Scheme Group's interest in Ecoland and created the false and misleading impression that the promoters truly supported the purchase of Ecoland stock as a wise investment. In reality, the sole purpose behind the promotional campaign was to generate interest in Ecoland stock so the Schemers' could dump their shares.

41.     Moreover, the email blasts from Paolucci's promotional websites did not disclose to subscribers that Paolucci and the other Scheme Group members received all of the proceeds generated from sales of Ecoland stock they controlled.

42.     To the contrary, many of the email blasts falsely stated that the promoter and/or its affiliates received only a fixed fee (*e.g.* $100,000) or "no form of compensation for coverage

of ECIT" other than restricted shares.

43.     These statements were materially false and misleading. A reasonable investor, before making the decision to purchase Ecoland stock, would have wanted to know the true economic benefits the Scheme Group was obtaining from the email blasts and their sales of unrestricted Ecoland stock.

**D.     Buonocore Joins The Scheme Group**

44.     During October 2011, Paolucci and Morelli grew increasingly dissatisfied with Rose's efforts, as the Scheme Group's nominee, to sell their Ecoland stock. By the end of October 2011, the Scheme Group had generated less than $150,000 from the sales, which was insufficient to finish paying off the Ecoland acquisition. Paolucci sought assistance from Buonocore, whom he knew from numerous other penny stock deals and promotions. He asked Buonocore to lead the scheme going forward and to keep an eye on Rose, who controlled the brokerage accounts where the Scheme Group's unrestricted shares were deposited.

45.     Buonocore agreed and joined the Scheme Group in October 2011. In early November 2011, Buonocore transferred $100,000 to a bank account controlled by Rose. The Scheme Group used Bounocore's contribution to help pay off the Ecoland acquisition price. In return, Buonocore was to receive an equal share (about 11.67%) of Ecoland stock sale proceeds with Rose and Morelli. Paolucci continued to receive 65% of the proceeds.

46.     Buonocore also began acting as a conduit for the payments to Paolucci, who did not want to receive payments directly from Rose or his entities. To that end, Paolucci instructed Rose to pay his 65% share to Buonocore, who then distributed the proceeds to various nominees designated by Paolucci, including Paolucci's purported girlfriend and landscaper.

47.     By the beginning of November 2011, Buonocore had also taken an active role in organizing and implementing the promotional campaigns touting Ecoland's stock. He and other

members of the Scheme Group met with and retained other individuals to promote Ecoland.  By November 2011, the Scheme Group had retained several additional penny stock promoters – including Promoter P, Promoter K, Promoter B, and Promoter H—to help tout Ecoland.

48.     Throughout November and December 2011, Rose and Buonocore continued to sell shares of Ecoland stock in the Spencer Edwards and Clear Water brokerage accounts. They often coordinated the sales through Draper, who communicated to the account representatives Rose's instructions concerning the price and amount of Ecoland stock to sell each day.

49.     During these two months, Ecoland's stock rose from a pre-scheme average daily volume of 412 shares to an average daily volume of 45,283 shares. The price of Ecoland stock regularly closed above $0.30 per share during the active promotions and fell to as low as $0.18 per share when the promotions paused at the end of December.

50.     Between November 7, 2011 and December 31, 2011, the Scheme Group realized more than $170,000 from the sale of over 500,000 shares of Ecoland stock into the promotions they orchestrated. They used some of these proceeds to pay for the promotions and to continue paying off the remainder of the money owed for the purchase of Ecoland, and distributed the rest as proceeds.

51.     During January and February 2012, Paolucci, acting on behalf of the Scheme Group, conducted a third period of email blasts touting Ecoland using his stock promotion websites. These email blasts ran in tandem with: (i) additional promotions orchestrated by other individuals and entities hired by the Scheme Group, and (ii) additional press releases Paolucci drafted and caused to be issued.

52.     Again, none of the email blasts disclosed that Paolucci and the other Scheme Group members controlled all of Ecoland's unrestricted stock, or that they were profiting by coordinating their stock sales with the blast emails. They also made similar misrepresentations

13

concerning the compensation received by the Scheme Group.

53.     Buonocore and Rose, often coordinating through Draper, continued to sell the Scheme Group's unrestricted Ecoland shares in conjunction with these promotional efforts.

54.     As the email blasts and other promotions advanced, Paolucci, Morelli and Buonocore became increasingly distrustful of Rose. Paolucci asked Rose to give Buonocore access to the Spencer Edwards account. On January 19, 2012, Rose provided Buonocore with his login information and Buonocore began selling Ecoland shares from the Spencer Edwards account.

55.     On January 23, 2012, Buonocore emailed Rose to inform him that the Scheme Group had sold more than 1.5 million shares of Ecoland's stock over the prior three days and they needed to "position some more stock." Buonocore also stated that he had "left some gtc's [good 'til cancelled sell orders] for tom[orrow] morn[ing]" and that the Scheme Group's selling represented approximately 27% of the total trading volume that day.

56.     The next day, Buonocore sent another email to Rose telling him the Scheme Group was down to 900,000 shares of Ecoland stock in the Spencer Edwards brokerage account. On January 30, 2012, Buonocore emailed Rose and instructed him to fax a written trading authorization to Spencer Edwards so that he could "call in trades and finish off the remaining [Ecoland] shares."

57.     During January and February 2012, Ecoland's average daily trading volume skyrocketed, Ecoland's volume weighted average closing price ("VWACP") increased to approximately $0.76, and the co-schemers continued to reap significant profits from their sales of the unrestricted shares of Ecoland stock.

58.     During January and February 2012, the Scheme Group sold more than three million shares of Ecoland stock out of the Spencer Edwards account and realized at least

$948,000 in proceeds. The Scheme Group also sold almost $2 million of Ecoland stock from the Clear Water account, thus realizing more than $2.9 million in proceeds between the two accounts during this two-month period.

**E.      The Scheme Group's Matched Trading Fraud**

59.      In addition to the orchestrated promotional campaigns, which relied on coordinated press releases, email blasts, and stock sales, the Scheme Group also used matched trades as part of their plan to manipulate the price of Ecoland stock. A matched trade is a form of manipulative trade that generally involves entering an order or orders for the purchase (or sale) of a security with the knowledge that a substantially similar order or orders to sell (or purchase) the same security has been or will soon be entered by the same or different parties working together.

60.      The Scheme Group arranged to have other individuals place orders to purchase shares of Ecoland stock that were substantially similar in size, time, and price as orders to sell shares of Ecoland stock placed by the Scheme Group. The intent and effect of the matched trades orchestrated by the Scheme Group was to create the appearance of an active and liquid market for Ecoland stock and to drive up the share price.

61.      The following tables identify matched trades arranged by Defendants as part of their market manipulation scheme:

| MATCHED TRADES BASED ON EXECUTION TIME AND PRICE | | | | | |
|---|---|---|---|---|---|
| Date | Execution Time | Price | # Shares Sold By Schemers | Purchasers | # Shares Purchased |
| 10/21/2011 | 10:38:00 AM | $0.28 | 6,900 | Purchaser 1 | 10,000 |
| 11/2/2011 | 10:51:00 AM | $0.27 | 6,900 | Purchaser 1 | 9,500 |
| 12/16/2011 | 1:19- 1:20 PM | $0.18 | 10,000 | Purchaser 2 | 10,000 |
| 1/5/2012 | 12:15:00 PM | $0.15 | 13,500 | Purchaser 3 | 15,000 |
| 1/19/2012 | 2:11-2:13 PM | $0.14 | 20,000 | Purchaser 4 | 20,000 |

| 1/19/2012 | 2:14:00 PM | $0.14 | 20,000 | Purchaser 5 | 20,000 |
|---|---|---|---|---|---|
| 1/19/2012 | 2:16:00 PM | $0.14 | 20,000 | Purchaser 6 | 20,000 |
| 1/19/2012 | 2:24:00 PM | $0.14 | 20,000 | Purchaser 7 | 20,000 |
| 1/19/2012 | 2:50:00 PM | $0.14 | 40,000 | Purchaser 8 & Purchaser 9 | 20,000 & 20,000 |

| MATCHED TRADES BASED ON DAILY VOLUME | | | | | |
|---|---|---|---|---|---|
| Date | Daily Volume | # Shares Sold By Schemers | Purchasers | # Shares Purchased | Min. # Shares Purchased From Schemers |
| 11/2/2011 | 67,530 | 23,930 | Purchasers 1 & 12 | 60,600 | 17,000 |
| 11/3/2011 | 135,780 | 95,450 | Purchasers 10 & 11 | 84,000 | 43,670 |
| 11/8/2011 | 40,200 | 15,639 | Purchaser 11 | 31,000 | 6,439 |
| 11/9/2011 | 86,600 | 49,400 | Purchasers 10 & 12 | 64,000 | 26,800 |
| 11/11/2011 | 22,130 | 13,000 | Purchaser 1 | 19,980 | 10,850 |
| 11/25/2011 | 25,778 | 11,740 | Purchaser 13 | 25,000 | 10,962 |
| 1/4/2012 | 116,115 | 88,500 | Purchaser 14 | 50,000 | 22,385 |
| 1/19/2012 | 166,490 | 159,065 | Purchasers 4, 5, 6, 7, 8 and 9 | 120,000 | 112,575 |

62.     Purchasers 1 through 12 listed in the above charts are individuals and/or affiliated entities who were retained by Promoter P, Promoter K and Promoter B on behalf of the Scheme Group to participate in the matched trading and promotion of Ecoland.

**F.     Defendants' Scheme Drove Up Ecoland's Stock Price And Trading Volume.**

63.     The Scheme Group's myriad efforts to promote Ecoland between October 2011 and February 2012 dramatically increased both Ecoland's share price and trading volume. The following table demonstrates the price and volume changes that occurred during the Scheme Group's promotions of Ecoland stock. Columns III, V, and VII represent the three distinct promotional periods during which the Scheme Group actively coordinated email blasts with the issuance of press releases.

| Column I | Column II | Column III | Column IV | Column V | Column VI | Column VII | Column VIII |
|---|---|---|---|---|---|---|---|
| Period | Jan. 1, 2011–Sept. 30, 2011 | Oct. 3, 2011–Nov. 18, 2011 | Nov. 19, 2011–Dec. 2, 2011 | Dec. 3, 2011–Dec. 20, 2011 | Dec. 21, 2011–Jan. 20, 2012 | Jan. 21, 2012–Feb. 17, 2012 | Feb. 18, 2012–Dec. 31, 2012 |
| Known Email Blasts | - | 46 | - | 23 | - | 59 | - |
| Press Releases | 1 | 5 | 1 | 3 | - | 7 | - |
| Total Volume | 77,925 | 1,402,151 | 175,586 | 1,149,949 | 1,033,884 | 73,139,228 | 8,427,343 |
| Avg. Daily Volume | 412 | 40,061 | 19,510 | 95,829 | 51,694 | 3,656,961 | 38,836 |
| % Change in AVG. Volume | N/A | 9616% | -51% | 391% | -46% | 6974% | -98% |
| Peak Daily Volume | 21,500 | 160,554 | 54,515 | 267,359 | 529,300 | 10,275,600 | 463,355 |
| Trading Days in Period | 189 | 35 | 9 | 12 | 20 | 20 | 217 |
| # of Days with 0 Trades | 176 | - | - | - | 1 | - | 19 |
| Price at the End of Period | $0.20 | $0.35 | $0.37 | $0.19 | $0.11 | $0.41 | $0.05 |
| Peak Price | $1.30 | $0.50 | $0.44 | $0.53 | $0.24 | $1.35 | $0.42 |
| VWACP | $0.31 | $0.32 | $0.36 | $0.36 | $0.13 | $0.76 | $0.18 |

64.     As indicated in the above chart, the Scheme Group's first coordinated

promotional campaign began on October 3, 2011 and continued through November 18, 2011.

During this first promotional period, the average daily volume (40,061) was nearly 100 times

greater than the average daily volume (412) between January 1, 2011 and September 30, 2011.

The average daily volume (19,510) fell by half after the first promotional period ended.

65.     During the second promotional period, which ran from December 3, 2011

through December 20, 2011, the average daily volume (95,829) rose again by almost 4 times, as

compared to the previous non-promotional period (19,510), and then fell by around half

(51,694) after the promotional period ended.

66.     In the third promotional period, from January 21, 2012 through February 17,

2012, the average daily volume skyrocketed again compared to the previous non-promotional period, this time by almost 70 times to an average daily volume of over 3.6 million shares per day. Once the promotional campaign ended, the average daily volume plummeted to about 39,000 shares per day through the rest of 2012.

67.     The VWACP also rose in conjunction with the promotional campaigns. The VWACP rose from $0.31, prior to the first promotional period, to $0.36 during the second promotional period, before falling to $0.13 after the second promotional period. During the third promotional period, the VWACP rose to $0.76 and then fell back down to $0.18 once the promotional period ended.

**G.      In Just Under Six Months, Defendants Made $3.3 Million.**

68.     Between September 30, 2011 and February 23, 2012, through their fraudulent actions, Defendants generated at least $3,299,000 in proceeds from the sale of Ecoland stock. Rose, as the Scheme Group's nominee, took responsibility for distributing to the other Defendants the proceeds from the brokerage and bank accounts under his control.

69.     Rose wired funds to Morelli and Buonocore directly from certain of the brokerage accounts in his control and also from a Global Media bank account he controlled. Buonocore then paid certain nominees designated by Paolucci. Rose also paid Draper $15,000 for his work.

70.     Although the Schemers agreed Paolucci was entitled to 65% of the proceeds and Rose, Morelli and Buonocore would evenly split the remaining 35%, Rose received a greater share of the proceeds than Morelli and Buonocore. The chart below reflects the amounts received by each Defendant.

| Berardino "Dino" Paolucci | $2,050,000 |
|---|---|
| Don Rose | $914,249 |
| Louis Buonocore | $200,000 |
| Frank Morelli | $158,700 |
| Jeremy Draper | $15,000 |

71.     On March 13, 2012, Ecoland changed its name to Novus Robotics, Inc. (ticker NRBT). It filed a Form 8-K with the Commission on April 12, 2012, announcing the name change.

72.     Throughout the course of their scheme, Defendants gained control of all 22 million of Ecoland's unrestricted shares and control and/or influence over 62 million of Ecoland's restricted shares, together representing over 90% of the total shares issued for the company.

73.     Despite having obtained ownership of more than 5% of Ecoland's stock, the Scheme Group, both collectively and individually, failed to file a Schedule 13D beneficial ownership report with the Commission or otherwise disclose publicly their control of Ecoland's securities, their purpose in acquiring the interests, or their plans or proposals for the acquisition, holding, or disposal of the securities.

## CLAIMS FOR RELIEF

### First Claim
Section 10(b) of the Exchange Act and
Rule 10b-5(a) and 10b-5(c)
[15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5]
**(Against All Defendants)**

74.     Plaintiff re-alleges paragraphs 1 through 73 of the Complaint as if set forth herein.

75.     Defendants, by engaging in the conduct described above, directly and indirectly, in connection with the purchase or sale of securities, and by use of the means and

instrumentalities of interstate commerce or the mails, or any facility of a national securities exchange, have: employed devices, schemes and artifices to defraud; and engaged in acts, practices or courses of business that have operated or will operate as a fraud and deceit upon other persons.

76.     Defendants acted knowingly or with severe recklessness.

77.     By reason of the foregoing acts and practices, Defendants violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and 10b-5(c) [17 C.F.R. § 240.10b-5(a), (c)] thereunder.

**Second Claim**
Section 10(b) of the Exchange Act and
Rule 10b-5(b)
[15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5]
**(Against Paolucci)**

78.     Plaintiff re-alleges paragraphs 1 through 73 of the Complaint as if set forth herein.

79.     Defendant Paolucci, by engaging in the conduct described above, directly and indirectly, in connection with the purchase or sale of securities, and by use of the means and instrumentalities of interstate commerce or the mails, or any facility of a national securities exchange, has made untrue statements of a material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Defendant Paolucci authored, caused to be sent, and had ultimate authority over the content of, the fraudulent and misleading email blasts sent to prospective investors during Defendants' promotional campaign.

80.     Defendant Paolucci acted knowingly or with severe recklessness.

81.     By reason of the foregoing acts and practices, Paolucci violated and, unless

enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

**Third Claim**
Section 17(a)(1) of the Securities Act
[15 U.S.C. § 77q(a)]
**(Against All Defendants)**

82.     Plaintiff re-alleges paragraphs 1 through 73 of the Complaint as if set forth herein.

83.     Defendants directly or indirectly, in the offer or sale of securities, and by use of the means and instrumentalities of interstate commerce or the mails, or any facility of a national securities exchange, have employed devices, schemes, and artifices to defraud.

84.     Defendants acted knowingly or with severe recklessness.

85.     For these reasons, Defendants violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

**Fourth Claim**
Section 17(a)(3) of the Securities Act
[15 U.S.C. § 77q(a)(3)]
**(Against All Defendants)**

86.     Plaintiff re-alleges paragraphs 1 through 74 of the Complaint as if set forth herein.

87.     Defendants directly or indirectly, in the offer or sale of securities, and by use of the means and instrumentalities of interstate commerce or the mails, or any facility of a national securities exchange, engaged in transactions, practices, and courses of business which operate or would operate as a fraud and deceit upon the purchasers.

88.     Defendants acted knowingly, with severe recklessness and/or negligently while engaging in the conduct alleged herein.

89.     For these reasons, Defendants violated and, unless enjoined, will continue to violate Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

**Fifth Claim**
Section  17(a)(2) of the Securities Act
[ 15 U.S.C.  § 77q(a)(2)]
**(Against Paolucci)**

90.     Plaintiff re-alleges paragraphs 1 through 73 of the Complaint as if set forth herein.

91.     Paolucci, directly or indirectly, in the offer or sale of securities, and by use of the means and instrumentalities of interstate commerce or the mails, or any facility of a national securities exchange, obtained money or property by means of untrue statements of a material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  Defendant Paolucci authored, caused to be sent, and had ultimate authority over the content of, the fraudulent and misleading email blasts sent to prospective investors during Defendants' promotional campaign.

92.     Paolucci acted knowingly, with severe recklessness, and/or negligently concerning the actions and omissions alleged herein.

93.     For these reasons, Paolucci violated and, unless enjoined, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

**Sixth Claim**
Section 13(d) of the Exchange Act
and Rules 13d-1 and 13d-2
[15 U.S.C. § 78m(d) and 17 C.F.R. §§ 240.13d-1 and 240.13d-2]
**(Against Rose, Paolucci, Morelli, and Buonocore)**

94.     Plaintiff re-alleges paragraphs 1 through 73 of the Complaint as if set forth herein.

95.     Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. § 240.13d-1] require any person that has acquired, directly or indirectly, beneficial ownership of more than five percent of a class of a registered equity security to file a statement with the Commission disclosing, among other things, the identity of its members and the purpose of its acquisition.

96.     A beneficial owner under Section 13(d) includes "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares . . . voting power . . . or investment power."

97.     Section 13(d)(3) of the Exchange Act further provides that when two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for purposes of the statute.

98.     Pursuant to Rule 13d-5(b), when two or more persons agree to act together for the purpose of acquiring and disposing of equity shares of an issuer, the group is deemed to have acquired the beneficial ownership of the securities held by the members as of the date of the group's formation.

99.     If a group acquires more than five percent of a class of an issuer's equity securities registered pursuant to Section 12 of the Exchange Act, the group must file a statement on Schedule 13D and file all required amendments.

100.    Rule 13d-1(a) [17 C.F.R. § 240.13d-1(a)] requires, among other things, that the disclosures be made by filing a Schedule 13D with the Commission, no later than ten business days following a more than five percent accumulation.

101.    Rule 13d-2(a) [17 C.F.R. § 240.13d-2(a)] requires that amendments to Schedule 13D be promptly filed if any material change to the facts set forth in the Schedule 13D occurs.

102.     Buonocore, Morelli, Paolucci and Rose were beneficial owners of the Ecoland stock they acquired because they possessed "the power to dispose, or to direct the disposition of" these equity securities (even though the ownership through the entities under Rose's control created the illusion that the stock was held by others and not by the co-schemers). They also acted as and are deemed a single "person" for purposes of Section 13(d) because they agreed to act, and did in fact act, together and in concert, as a syndicate or other group, for the purpose of acquiring, holding and disposing of this stock.

103.     During August through November, 2011, Defendants Rose, Paolucci, Morelli, and Buonocore, acting together and in concert through Rose's entities, acquired all of Ecoland's unrestricted shares, representing 24.8% of the company's total issued stock. In addition, the Schemers later, while acting together and in concert, disposed of at least 6.77% of the issued Ecoland stock through their stock sales to the investing public.

104.     Defendants Rose, Paolucci, Morelli, and Buonocore, after acquiring directly or indirectly the beneficial ownership of more than 5% of a class of equity securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], failed to file with the SEC a statement containing the information required by Schedule 13D [17 C.F.R. § 240.13d-1 and 13d-2] and, after disposing of beneficial ownership of securities in an amount equal to 1% or more of the class of securities, failed to file with the SEC an amendment disclosing this material change.

105.     Defendants Rose, Paolucci, Morelli, and Buonocore violated, and unless restrained and enjoined, will in the future violate Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)]and Rules 13d-1 and 13d-2 [17 C.F.R. § 240.13d-1 and 13d-2].

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

(1)     Enter an Order finding that Defendants committed, and unless restrained will continue to commit, the violations alleged in this Complaint;

(2)     Permanently enjoin Defendants from future violations of Section 10(b) and Rule 10b-5 thereunder,

(3)     Permanently enjoin Defendants from future violations of Section 17(a) of the Securities Act;

(4)     Permanently enjoin Defendants Rose, Paolucci, Morelli, and Buonocore from future violations of Section 13(d) of the Exchange Act and Rule 13d-1 and 13d-2 thereunder.

(5)     Order Defendants to disgorge all ill-gotten gains from the conduct alleged herein, with prejudgment interest;

(6)     Order civil penalties against Defendants pursuant to Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act for violations of the federal securities laws as alleged herein; and

(7)     Impose penny stock bars against Defendants Rose, Paolucci, and Draper, pursuant to Section 20(g) of the Securities Act and Section 21(d)(6) of the Exchange Act.

(8)     Order such other and further relief as the Court may deem just and proper.


Plaintiff demands trial by jury on all issues so triable.

Dated: September 29, 2016                    Respectfully submitted,


                                    By:    _____
                                           Daniel J. Hayes (IL Bar No. 6243089)
                                           Anne C. McKinley (IL Bar No. 6270252)
                                           Richard G. Stoltz (IL Bar No. 6287486)
                                           U.S. Securities and Exchange Commission
                                           Chicago Regional Office
                                           175 W. Jackson Blvd., Suite 900
                                           Chicago, Illinois 60604
                                           (312) 353-3370